IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JAMES RAY THOMPSON, JR.                                                        PLAINTIFF

   v.   Civil No. 4:10-cv-04113

SHERIFF RON STOVALL;
MS. CHARLOTTE HOLLIVERSE;
and MS. ALICE MILLER                                                            DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

  James Ray Thompson, Jr. (hereinafter Thompson), filed this case pursuant to the provisions of 42 U.S.C. § 1983.  He proceeds *pro se* and *in forma pauperis*.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation.

  Thompson is currently incarcerated in the Cummins Unit of the Arkansas Department of Correction in Grady, Arkansas.  During the times relevant to this case, Thompson was incarcerated in the Miller County Detention Center (MCDC), located in Texarkana, Arkansas.  Thompson maintains he was subjected to unconstitutional conditions of confinement, denied access to a law library, his grievances were not responded to, his mail was interfered with, and he was put on lock-down without due process.

  Defendants have filed a motion for summary judgment (ECF No. 43).  Thompson filed his own statement of facts (ECF No. 50) and a response to the motion (ECF No. 54).  The motion is before me for issuance of this report and recommendation.

**1.  Background**

Thompson was incarcerated at the MCDC from February 1, 2010, until January 19, 2012. *Plaintiff's Response* (ECF No. 54) at ¶ 1 (hereinafter *Plff's Resp.*).  Thompson was convicted on August 26, 2010. *Id.* at ¶ 3.

Defendant Alice Miller (hereinafter Miller) has been continuously employed at the MCDC since January 2009. *Defendants' Exhibit* A at ¶ 3 (hereinafter *Defts' Ex.*).  In August of 2010, Miller was one of two or three day shift sergeants at the MCDC. *Id.* at ¶ 4.  According to Miller, when an inmate commits an infraction of the rules and it is determined the inmate should be placed on lock-down, a disciplinary report is completed. *Id.* at ¶ 7.  The inmate is placed on lock-down and remains on lock-down until a disciplinary hearing is held. *Id.* at ¶ 8.  Depending on the outcome of the hearing, the inmate is either taken off lock-down or remains on lock-down for the time period recommended by the "disciplinary hearing." *Id.*

According to Miller, there are no records in Thompson's file showing that he was placed on lock-down. *Defts' Ex.* A at ¶ 9.  Miller also maintains there are no copies of any grievances in Thompson's file in which he complains of being on lock-down. *Id.* at ¶ 10.  Miller believes it is possible that Thompson is "confused about whether he was on lock-down or is referring to being placed in a Super Max pod as being 'lock-down.'" *Id.* at ¶ 11.

During the time Thompson was incarcerated at the MCDC, the jail was undergoing renovations. *Defts' Ex.* A at ¶ 12.  As a result of the renovations, Miller indicates inmates had to be shifted around. *Id.* at ¶ 13.

On August 9, 2010, Thompson indicates he and Joshua Cupples were removed from West A medical pod and taken to a holding cell in the booking area because four inmates had told Miller that Cupples was stealing and that Thompson was starting trouble.  (ECF No. 50 at pg. 1).

Thompson was then moved to Super Max. *Id.* at pg. 2. He maintains the other inmates in the cell block were there for disciplinary violations and had received hearings. *Id.* However, Thompson admits he has no personal knowledge that everyone in Super Max was there for disciplinary reasons. *Resp.* at ¶ 15. He did know that his cell mate, Tamarkus Miles, was there for disciplinary reasons. *Id*. Moreover, Thompson indicates his relatives were told he was placed in Super Max for his own good. (ECF No. 50 at pg. 2).

Thompson concedes he may have been moved from West A medical pod to Super Max because of the renovations. *Resp.* at ¶¶ 14-15. Super Max was a lock-down pod. *Id*. at ¶ 15. Inmates are only allowed out of the cells for showers and to make phone calls. *Id.* Inmates in West A medical pod had unlimited movement. *Id.*

Even if he a portion of the time he spent in Super Max was due to renovations, Thompson asserts he remained in Super Max for forty-four days. *Resp*. at ¶ 14. He indicates inmates who were moved because of renovations only remained in Super Max for four to five days. (Doc. 50 at pgs. 6-7). Thompson maintains he should have never been placed in Super Max for forty-four days without being charged with a disciplinary and having an opportunity to be heard. (Doc. 50 at pg. 3).

Thompson states that the inmate placement sheet will show that he was in "Super [M]ax where [he] was lock[ed] down in cells 10, 8 and 6." *Plff's Resp.* at ¶ 9. Thompson states he did not confuse lock-down with being placed in Super Max. *Id.* at ¶ 11. He was released from Super Max on September 22nd but was not given a reason for his release. *Id.* at ¶ 15.

Thompson received three meals a day and something to drink with each meal. *Resp.* at ¶¶ 16-17. Water was available between meals. *Id.* at ¶ 18. The diet was sufficient to maintain his health. *Id.*

He was allowed to clean his cell. *Resp.* at ¶ 19. He had a bunk or a mattress and blanket to sleep on each night. *Id.* at ¶ 20 & ¶ 23. He had adequate clothing. *Id.* at ¶ 21.

While he was in Super Max, Thompson states he was denied recreation. *Id.* at ¶ 24. When he was housed in other parts of the detention center, he was allowed outside once or twice a month. *Id.* On one occasion, he went for two months without having outside recreation. *Id.* According to Thompson, Defendants called it recreation when inmates were allowed in the day room. *Id.* However, Thompson maintains that if an inmate was attempting to exercise some of the guards told them to stop while other guards didn't care as long as the inmates kept their shirts on.. *Id.* Thompson indicates he developed physical problems as a result of not having opportunities to exercise. *Id.* When he reported this to Nurse Williams, she merely replied that she had nothing to do with that. *Id.*

Thompson was represented by counsel in his criminal case. *Resp.* at ¶ 25. He did not miss any deadlines for filing documents with the court. *Id.* at ¶ 26.

He was able to send and receive both personal and legal mail. *Id.* at ¶¶ 29-30. Thompson indicates an indigent bag was provided to the inmates weekly which, among other things, contained two envelopes. *Id.* at ¶ 40. However, he indicates he had to purchase stamps from the commissary. *Id.*

On one occasion his outgoing mail did not reach its destination. *Resp.* at ¶ 35. Thompson indicates the day he was transferred out of the MCDC he sent a letter to Gabrielle Holmes that she did not receive. *Id.*

On two occasions his legal mail was opened outside of his presence. *Resp.* at ¶ 31. One of the documents opened was from the Innocence Project. *Id.* Inmates were not to seal outgoing mail. *Id.* at ¶ 32. Thompson objects to this practice because he was sending mail to this Court. *Id.*

The MCDC had regular visitation days. *Resp.* at ¶ 33. He was allowed to have visitors on regular visitation days. *Id.*

Thompson maintains inmates received an insufficient supply of toilet paper. Each Monday toilet paper was handed out. *Resp.* at ¶ 36. Almost every week, Thompson indicates he would be without toilet paper for one to two days. *Id.* This caused physical problems such as itching and burning. *Id.* Sometimes additional rolls could be obtained by trading commissary items for it or stealing it. *Id.* If more was obtained, it usually did not come from correctional officers. *Id.*

Thompson was able to obtain grievance forms from the jailers when he needed them. *Resp.* at ¶ 37. The filled out grievance forms were turned back into the jailers. *Id.* Many times he indicated the jailers would not sign them. *Id.* Thompson believes he submitted thirteen different grievances. *Id.* He only received responses to two of the grievances dealing with requests for legal materials. *Id.*

Thompson was allowed to shower and had basic hygiene items such as soap, shampoo, and toothpaste. *Id.* at ¶ 41. While he purchased his items from the commissary, Thompson indicates the indigent bags contained deodorant, toothpaste, shampoo, and a toothbrush. *Id.* Other than the lack of exercise, he does not contend that the conditions he was housed under caused his health to suffer or caused him any physical injury. *Id.* at ¶ 42.

When asked how Sheriff Stovall violated his rights, Thompson responded that there was a sign in the booking area that said inmates had the right to access to a law library. *Resp.* at ¶ 38. When he spoke to Sheriff Stovall about not having access, Thompson states he was told he needed to talk to his attorney. *Id.* With respect to Miller, Thompson maintains she violated his rights by placing him in Super Max on lock-down for forty-four days without due process. *Id.* Thompson

contends Miller County had a custom, policy, or practice of placing inmates on lock-down in Super Max. *Id.* at ¶ 43.

### 2. Applicable Standard

"Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and inferences in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). However, the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. *See Celotex v. Catrett*, 477 U.S. 317, 324 (1986).

### 3. Arguments of the Parties

Defendants first argue there is no suggestion of a custom or policy of Miller County which resulted in a violation of the Plaintiff's constitutional rights. As such, they contend there is no legal basis on which Miller County can be held liable. Second, they maintain that short term denials of outside recreation are not of constitutional dimension. Defendants argue the other alleged unconstitutional conditions of confinement are trivial and do not state a claim. Third, they assert Thompson's denial of access to a law library claim fails because he suffered no actual injury. Fourth, even if Thompson's grievances were not responded to, Defendants state this does not amount to a constitutional violation. Fifth, Defendants maintain there is nothing unreasonable or unconstitutional about requiring outgoing mail to be inspected prior to being mailed. With respect to the alleged opening of legal mail on one or two occasions, Defendants maintain this is insufficient to form the basis of a constitutional violation. Finally, they maintain there is absolutely no evidence to substantiate a claim that Thompson was placed on lock-down without a disciplinary hearing.

In response, Thompson argues: the Defendants actions were pursuant to one or more of Miller County's customs or policies; he was denied opportunities for indoor and outdoor exercise repeatedly and for as long as two months at a time; the lack of a law library resulted in him being unaware of certain motions he could have filed in his criminal case; he received no responses to his grievances; his mail was tampered with on more than one occasion and he was required to leave all outgoing mail unsealed; and he remained on lock-down for forty-four days without receiving notice of a disciplinary action or an opportunity to be heard.

### 4.  Discussion

Plaintiff maintains he was subjected to unconstitutional conditions of confinement, denied access to a law library, his grievances were not responded to, his mail was interfered with, and he was put on lock-down without due process.  I will address each claim in turn.

*Unconstitutional Conditions of Confinement*

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.  *See also Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006)(deliberate indifference standard of the Eighth Amendment applies to claims brought by pretrial detainees that prison officials failed to provide adequate food, clothing, shelter, etc.). The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the

"wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004)(*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the Plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

Here, Thompson alleges a variety of conditions violated his constitutional rights. However, he concedes: he received three meals a day with something to drink with each meal; he had access to drinking water between meals; the meals were sufficient to maintain his health; he was able to clean his cell; he had a bunk or a mattress to sleep on each night and was allowed to clean the cover of the mattress; he had adequate clothing; he had access to basic hygiene items; he was allowed to send and receive mail; and he was allowed visitors. No genuine issue of fact exists as to these conditions.

This leaves Thompson's claims concerning the lack of exercise and an insufficient supply of toilet paper. A constitutional violation exists if prison officials are deliberately indifferent to an

inmate's exercise needs. *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened." *Id.* Among factors the court should consider in reviewing such a claim are: (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement. *Id.*

Thompson states he was allowed outside recreation once or twice a month with the exception of a two month period where he did not receive outside recreation. While exercises could be done in the day room, Thompson indicates jailers would often tell the inmates to stop exercising. As a result of the lack of exercise, he suffered unspecified physical problems. He spoke to the nurse but she said she could do nothing about that.

It has been recognized that "short-term denials of exercise may be inevitable in the prison context." *See Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001); *see* also *Leonard v. Norris*, 797 F.2d 683, 685 (8th Cir. 1986)(fifteen days of no out-of-cell exercise not cruel and unusual punishment); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(45 minute out-of-cell recreation time per week did not violate the Eighth Amendment rights of inmate in protective custody). Defendants have provided no affidavits or other documents that indicate what exercise opportunities were available to Thompson or what opportunities he had to be out of his cell. I believe a genuine issue of material fact exists that precludes summary judgment in Defendants' favor on this claim.

With respect to the shortage of toilet paper, I also believe a genuine issue of material fact exists that precludes summary judgment in Defendants' favor. According to Thompson, almost every week he was out of toilet paper for one to two days. He indicates he could trade other inmates for

toilet paper or steal it but you could "mainly not" get more from jailers. As a result of the insufficient supply, he contends he suffered itching and burning.

### *Denial of Access to a Law Library*

"Inmates have a constitutional right of access to the courts that requires the provision of some means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bear v. Fayram*, 650 F.3d 1120, 1122-23 (8th Cir. 2011)(internal quotation marks and citations omitted). This right may be satisfied in a number of ways such as with "prison libraries, jailhouse lawyers, or private lawyers on contract with the prison, or some combination of these and other devices." *Id*. at 1123. To establish a violation of this right, the inmate must show an "actual injury" by "demonstrat[ing] that the alleged shortcomings hindered his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351 (1996).

Thompson indicates he needed access to a law library to review matters in connection with his criminal case. *Resp.* at ¶ 38. He did not miss any deadlines for filing documents with the Court. *Id.* at ¶ 26. However, he states he did not know about various motions he could have filed in his criminal case. *Id.* at ¶ 27.

Having been afforded an attorney, Thompson was not also entitled to access to an adequate law library. *See United States v. Kind*, 194 F.3d 900, 905 (8th Cir. 1999)(*pro se* defendant has right of access to adequate law libraries or adequate assistance from person trained in the law). The attorney afforded him access to the courts. Furthermore, he has not alleged that he suffered "an actual injury, that is, hindrance of a nonfrivolous and arguably meritorious underlying legal claim." *Hartsfield v. Nichols*, 511 F.3d 826, 831 (8th Cir. 2008).

### *Inadequate Grievance Procedure*

No independent constitutional right to access to a grievance procedure exists. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993)("[A] prison grievance procedure is a procedural right only"). "When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance." *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991). The failure of detention center personnel to respond to his grievances did not impair Thompson's right of access to the courts.

### *Interference with Mail*

Thompson maintains his personal mail did not reach its destination on one occasion, his legal mail was opened twice outside of his presence, and he was not allowed to seal outgoing mail. Inmates have a First Amendment right of free speech to send and receive mail. *Hudson v. Palmer*, 468 U.S. 517, 547 (1984). "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125 (1977). Restrictions on this First Amendment right are valid "only if [they are] reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987). "[E]conomic factors may . . . be considered . . . in choosing the methods used to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial." *Bell-Bey v. Williams*, 87 F.3d 832, 838 (8th Cir. 1996)(*citing Bounds v. Smith*, 430 U.S. 817, 824-25 (1977)).

Neither short delays in outgoing mail due to screening procedures nor the fact that inmates cannot seal outgoing non-privileged mail violates the First Amendment. *Thornburgh v. Abbott*, 490

U.S. 401, 415-19 (1989)(holding a policy which allows prison officials to reject incoming mail as detrimental to security does not violate the First Amendment); *Smith v. Delo*, 995 F.2d 827, 830-31 (8th Cir. 1993)(policy requiring non-privileged mail to be unsealed so that it could be inspected for contraband and proper addressing not violative of the constitution); *Harris v. Bolin*, 950 F.2d 547, 550 (8th Cir. 1991)(policy of screening mail not violative of the First Amendment rights of prisoners); *United States v. Baumgarten*, 517 F.2d 1020, 1028 (8th Cir. 1975)(screening procedure that called for jailor to read letters was permissible if done pursuant to a custom, practice, or regulation that was reasonably related to the maintenance of jail security).

An isolated instance of opening confidential legal mail, without any evidence of improper motive, does not support a § 1983 claim. *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997). Similarly, an isolated instance of outgoing mail not arriving at its destination is insufficient. Here, Thompson has not suggested there was any ongoing practice of censorship or that the application of any policy resulted in the alleged interference. *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)(Plaintiff must show regular and unjustifiable interference--an isolated incident of mail tampering is usually insufficient to establish a constitutional violation). This is insufficient.

Thompson also claims that outgoing legal mail had to be unsealed. In general, it is permissible for a jail to search outgoing prisoner mail for contraband or escape plans, etc. *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999). With respect to outgoing privileged mail, courts have approved policies in which legal mail must be sealed in the presence of a staff member. *See e.g., Weatherspoon v. Ferguson*, 398 Fed. Appx. 7 (5th Cir. 2010). In this case, it appears Thompson was not present when his outgoing legal mail was inspected. Without more information on the mail procedures, the Court cannot apply the balancing test from *Turner v. Safley*, 482 US. 78 (1987) to

determine if a reasonable relationship exists between the questioned policy of requiring all outgoing mail to be unsealed and a legitimate penological interest. A fact question exists as to this issue.

### *Due Process*

Thompson maintains his Due Process rights were violated when he was placed in Super Max without a reason being given or an opportunity to be heard. "The Supreme Court has outlined the procedures correctional facilities must follow to conduct an impartial due process hearing on a disciplinary matter." *Hartsfield v. Nichols*, 511 F.3d 826, 830 (8th Cir. 2008)(*citing Wolff v. McDonnell*, 418 U.S. 539, 563-66 (1974)). These procedures include written notice of the charges, a brief period to prepare, a written statement of the evidence relied on and reasons for the disciplinary action, and the ability for the inmate to call witnesses and present documentary evidence. *Id; see also Dible v. Scholl*, 506 F.3d 1106, 1110 (8th Cir. 2007).

In this case, Defendants maintain Thompson was not moved to Super Max for disciplinary reasons but because of ongoing renovations. Furthermore, Defendants state there is nothing in Thompson's jail file to suggest he was moved to, or remained in, Super Max for disciplinary reasons. Thompson concedes he may have been moved because of renovations. However, at some point, he maintains he continued to be housed in Super Max for punitive reasons. In support, he notes other inmates moved because of renovations typically remained in Super Max for one to five days while he remained there for forty-four days. Thompson also points out that Defendants have complete control over his jail file and the reason no paperwork exists is Defendants did not put it in his jail file or simply did not go through the necessary steps when an inmate is charged with a disciplinary violation. On the record before me, I believe there are genuine issues of material fact that exist as to this claim.

### 5. Conclusion

For the reasons stated, I recommend that the motion for summary judgment (ECF No. 43) be granted in part and denied in part. Specifically, the motion should be granted with respect to the following: (1) all conditions of confinement claims except Thompson's claim regarding the lack of exercise and an insufficient supply of toilet paper; (2) the access to the court's claim; (3) interference with the mail claims stemming from one letter not reaching its destination and two legal envelopes being opened outside his presence; and (4) the inadequate grievance procedure claim. This leaves for later resolution: (1) the conditions of confinement claims stemming from lack of exercise and lack of a sufficient supply of toilet paper; (2) his claims that the policy of requiring all outgoing mail to be unsealed is violative of the constitution; and (3) his Due Process claim stemming from the forty-four day incarceration in Super Max.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this **15-th day of February 2012.**

/s/ Barry A. Bryant
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE