IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

JAMES RAY THOMPSON, JR.                                                    PLAINTIFF

V.                            CIVIL NO. 4:10-cv-04113

SHERIFF RON STOVALL;
and ALICE MILLER                                                          DEFENDANTS

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by Plaintiff, James Thompson, pursuant to the provisions of 42 U.S.C. § 1983. Plaintiff proceeds *pro se* and *in forma pauperis*. Pursuant to the provisions of 28 U. S. C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, United States District Judge, referred this case to the undersigned for the purpose of making a report and recommendation. An evidentiary hearing was held on October 12, 2012. The case is now ready for decision.

Plaintiff is currently incarcerated in Arkansas Department of Corrections Cummins Unit in Grady, Arkansas. The events at issue in this case occurred while Plaintiff was incarcerated in the Miller County Detention Center ("MCDC"). Specifically, Plaintiff maintains: (1) that his due process rights were violated when he was locked down in the "Super Max;" (2) that he was subjected to unconstitutional conditions of confinement; and (2) that he was subjected to an unconstitutional mail policy.[1] Only the due process claim remains against Sergeant Miller, while all three claims remain against Sheriff Stovall.

---

[1] Plaintiff originally asserted additional claims against multiple parties, however, those claims were dismissed at the summary judgment stage. ECF No. 55 and 57.

1

I.      **BACKGROUND AND EVIDENCE**

At the evidentiary hearing, the testimony of the following witnesses was heard: (1) Plaintiff James Thompson; (2) Kevin Dixon; (3) Sergeant. Miller; (4) Sheriff Ron Stovall; and (5) Jason Mitchell.  For purposes of this Report and Recommendation, the testimony of the witnesses will be briefly summarized.

**Plaintiff James Thompson**

Plaintiff was incarcerated at the MCDC beginning on February 1, 2010.  From February 1, 2010 until August 9, 2010 Plaintiff was housed in the general population.  This allowed Plaintiff to shower when he liked and he enjoyed phone and commissary privileges.  On August 9, 2010, fellow inmates informed Sergeant Miller that Plaintiff was starting trouble.  Plaintiff went to the courthouse this same day to change attorneys and when he returned to the MCDC they placed him in the "Super Max" also known as "A-Pod" and "Max A."[2]  Plaintiff stayed in the A-Pod until September 22, 2010.  Plaintiff testified this transfer violated his due process rights.

Plaintiff also testified he was placed on "lockdown" in the A-Pod because he tried to get a new attorney for his criminal proceedings or because fellow inmates complained about him being "racial."  Another inmate was moved to A-Pod from general population, the same day as Plaintiff, for stealing.  Sergeant Miller is the officer that ordered Plaintiff be placed in A-Pod, but Sergeant Miller never gave Plaintiff a reason for the transfer.  Plaintiff submitted six to nine grievances about the transfer but he did not receive any response.  Plaintiff testified other inmates where

---

[2] Plaintiff referred to the pod he was transferred to on August 9, 2010 as the "Super Max."  However, Sergeant Miller and Sheriff Stovall refer to this same unit as "A-Pod" or "Max A."  To avoid confusion, the Court will refer to this pod as A-Pod throughout this Report and Recommendation unless otherwise indicated with quotation marks.

2

placed in A-Pod for disciplinary reasons. Ongoing renovations at the MCDC during this time also caused inmates to be moved from pod to pod.

Further, Plaintiff testified, while he was on "lockdown" in A-Pod, Plaintiff could not call his family or prepare for his criminal trial, however, Plaintiff also testified he had phone privileges, but was only allowed to use the phone at certain times of the day. Plaintiff was let out of his cell into the dayroom of A-Pod for one hour each day. Plaintiff also testified, while in A-Pod, he was let out of his cell for one hour to shower, use the phone, and visit the commissary, however, he was not allowed these privileges everyday. Additionally, in A-Pod Plaintiff was not allowed to watch television, mingle, or talk to religious people that came to the MCDC.

As to his lack of exercise claim, Plaintiff testified he did not have regular outside recreation privileges while housed in A-Pod. Two or three months would pass without outside recreation. Plaintiff testified he did not suffer any injury from this lack of exercise.

Plaintiff also testified the usual weekly allotment of toilet paper at the MCDC was one to two rolls. Occasionally, however, toilet paper was not handed out at all or the amount distributed was different than the usual one to two rolls. Because Plaintiff took stool softeners, the weekly allotment of toilet paper was insufficient for him. Plaintiff had to barter with fellow inmates to obtain more toilet paper. Plaintiff asked the MCDC officers for extra toilet paper—some times he received it and some times he did not. Additionally, the weekly allotment of toilet paper was not always on time. Plaintiff testified he suffered hemorrhoid problems, and the lack of toilet paper caused him itching and burning. These problems were not serious enough for Plaintiff to seek any treatment through the MCDC sick-call process.

When Plaintiff first arrived at the MCDC he could seal his mail prior to sending it. At

3

some unspecified time, this policy changed, and Plaintiff was forced to leave all mail, except for legal mail, unsealed. Only one of Plaintiff's mailings did not arrive to the intended recipient.

**Kevin Dixon**

Kevin Dixon testified he was an inmate at MCDC and housed in A-Pod in September 2010. Dixon remembers Plaintiff being housed in A-Pod with him. Dixon testified he was not placed in A-Pod for disciplinary reasons and he never received a disciplinary hearing. Dixon was not told a reason why he was placed in A-Pod in September 2010. On one prior occasion, Dixon was placed in A-Pod. He was given a disciplinary hearing at that time.

Dixon explained that "A-Pod," "Max A," and the "Super Max" are all names for the same pod, and the "Super Max" is not "E-Pod" but "A-Pod." "Max E" in "E-Pod" was previously the "Super Max," but it was changed in July or August of 2010 to "A-Pod."

Dixon also testified renovations where being conducted at the MCDC at the time in issue but only in the trustee pod. Violent offenders where housed in A-Pod.

**TaMarcus Miles**

TaMarcus Miles did not appear and give testimony at the hearing.[3] The Court allowed Plaintiff to present Miles's expected testimony to allow the parties to determine if they could stipulate to such testimony. Plaintiff represented that Miles was Plaintiff's cell mate in A-Pod in August and September 2010. Miles would testify he received a disciplinary hearing and thirty (30)

---

[3] The Court issued a subpoena for Miles on September 14, 2012 using the address provided by Plaintiff. ECF No. 74. After learning from the U.S. Marshal service that Miles no longer lived at the address provided by Plaintiff, the Court issued a second subpoena on October 1, 2012. ECF No. 77. Service of the second subpoena was executed on Miles on October 2, 2012. ECF No. 80. However, Miles did not appear to testify at the hearing on October 12, 2012.

days punitive "lockdown" in A-Pod.

Defendants were unable to stipulate to the accuracy of Miles's purported testimony. The Court determines, however, even if Miles's testimony were given as proffered by the Plaintiff, such testimony would have no impact on the Court's Report and Recommendation.

**Sergeant Alice Miller**

Alice Miller was a sergeant at the MCDC in September 2010. Sergeant Miller remembers Plaintiff as an inmate but does not recall placing him in A-Pod. Sergeant Miller testified she never placed Plaintiff on "lockdown" and Plaintiff is confused as to what is considered "lockdown" at the MCDC.

Sergeant Miller testified she did not have the authority to place an inmate in the "Super Max." In order for an inmate to be transferred to the "Super Max," Sergeant Miller had to file a report on the inmate and someone higher in the administration made the diciplinary decision. For example, when an inmate committed an infraction an officer filed a disciplinary report against the inmate. A disciplinary officer then determined whether the inmate would be placed on "lockdown." The inmate remained on "lockdown" until a disciplinary hearing was held.[4] Additionally, Sergeant Miller testified any instance of "lockdown" would be noted on Plaintiff's

---

[4] This explanation comports with the MCDC Policy and Procedures: "When a staff member determines an inmate or inmates have violated facility rules and regulations, a disciplinary report will be written . . . Once the disciplinary report has been written, the charged inmate should ordinarily receive a copy of the written disciplinary report . . . the charged inmate will appear before the Disciplinary Committee ordinarily within three (3) working days after receipt of the written disciplinary report . . . " Defendants' Ex. 5, p. 6. "Inmates committing rules violations are placed in Disciplinary Segregation status ordinarily after appearance before the Disciplinary Committee." Defendants' Ex. 5, p. 5.

Custody Log and no such notations exists.  *See* Defendants' Ex. 6.[5]

Further, Sergeant Miller testifies "A-Pod" was not the "Super Max" in August and September 2010.  A-Pod is not open barracks and does have individual cells that are kept locked, but the inmates in the two tiers of cells alternate spending four hours a day out in the common area.  At some point A-Pod was changed to the "lockdown" pod or "Super Max" pod, but this change was not implemented while Plaintiff was housed there.

Sergeant Miller also testified, the MCDC was undergoing renovations during September 2010 and inmates, including Plaintiff, were moved around from pod to pod to accommodate the renovations.

Finally, Sergeant Miller testified male inmates at MCDC get one roll of toilet paper each Monday.  Plaintiff never complained to Sergeant Miller about his toilet paper supply.

**Sheriff Ron Stovall**

Sheriff Stovall testified "Max E" also know as "E-Pod" was made the disciplinary pod when he assumed his duties as Sheriff of Miller County.  "Max E" is still the "Super Max" and "Max A" also known as "A-Pod" is also now a "Super Max" pod.  However, Sheriff Stovall testified "A-Pod" was not a "Super Max" pod in August and September of 2010.[6]

---

[5] The Court notes that Plaintiff's Custody Log presents more questions than answers as to Plaintiff's housing location at the MCDC.  *See* Defendants' Ex. 6.  For example, it indicates he was housed in "MA-06" from March 28, 2010 to August 21, 2010 and then moved to "MA-08" on August 21, 2010 were he remained until September 5, 2010.  Defendants' Ex. 6.  Sergeant Miller testified that "MA-06" was inside A-Pod.  This is in complete contradiction to Plaintiff's testimony that he was moved into the A-Pod or "SuperMax" as he calls it on August 9, 2010.  Sergeant Miller could not adequately decipher the information contained in Defendants' Ex. 6, therefore, the Court lends it little weight in this Report and Recommendation.

[6] According to the Miller County Sheriff's Office Detention division Policy and Procedures, the "Super Max Unit" is "a secure, lockdown unit.  Inmates in this unit are separated

**Jason Mitchell**

Mr. Mitchell was Plaintiff's public defender. He did not remember Plaintiff complaining of being on "lockdown." Mitchell was never allowed to see where Plaintiff was housed in the MCDC, instead, all attorney visits were conducted in an interview room separate from the inmate population.

**II.　DISCUSSION**

Plaintiff was convicted on August 26, 2010. ECF No. 54, p. 2. I find credible Plaintiff's testimony that he was moved into the A-pod on August 9, 2010. Therefore, Plaintiff was a pretrail detainee at the time he was placed into A-Pod.

　　A.　Due Process

The law is clear that a pretrial detainee cannot be punished. *See Bell v. Wolfish,* 441 U.S. 520, 535 (1979). "However, not every disability imposed during pretrial detention amounts to punishment in the constitutional sense." *Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir. 1996) (internal quotations omitted). "Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Bell,* 441 U.S. at 537. When determining whether a particular restriction or condition is considered punishment, the Court should consider whether the restriction or condition is reasonably related to a legitimate governmental objective. *Martinez v. Turner*, 977 F.2d 421,

---

from the general inmate population and are ordinarily assigned to two man cells. Inmates housed in the Super Max Unit are assigned to either Administrative Detention or Disciplinary Segregation status." Defendants' Ex. 5, p. 5. "Administrative Detention" is defined as "non-punitive and does not ordinarily involve the loss of privileges. Subjects confined to Administrative Detention are pending classification, Disciplinary Committee, or transfer." *Id.* "Privilege" is defined as "Visitation, Commissary, and Personal property (with the exception of basic personal hygiene items.)." *Id.*

7

423 (8th Cir. 1992). *See also Bell,* 441 U.S. at 539 ("if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment."). Furthermore, the Court is not concerned with *de minimis* levels of imposition on inmates. *Id.* The Supreme Court instructs the Court to be mindful that these type of inquires "spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility." *Bell*, 441 U.S. at 539.

The Court credits Plaintiff's testimony that he was transferred to A-Pod on August 9, 2010, and as a result of this transfer, his ability to mingle; shower and make phone calls when he pleased; and watch television were limited. However, the Court also credits Sergeant Miller and Sheriff Stovall's testimony that: (1) A-Pod was not the "Super Max" in August and September 2010; (2) Plaintiff did not receive a diciplinary for any infractions in August or September 2010; (3) Plaintiff was never placed on "lockdown"; (4) Plaintiff was allowed out of his cell during the usual four hour rotation in A-Pod; and (5) inmates were moved around from pod to pod during this time because the MCDC was undergoing renovations. The Court also finds convincing Sergeant Miller's testimony that she would not have effected Plaintiff's transfer to "lockdown" in the "Super Max" because she did not have the authority to lock down an inmate. Further, Plaintiff testified to punitive reasons he believed prompted his transfer to A-Pod but admitted that he was never told why he was transferred. Plaintiff also agreed that inmates where transferred from pod to pod during this time due to the renovations of MCDC. I find the record does not indicate Plaintiff was transferred to A-Pod for punitive reasons or that he was on "lockdown" once transferred into A-Pod.

8

The evidence indicating Plaintiff's transfer was incidental to a legitimate governmental purpose supports the Courts finding. *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992). Sergeant Miller testified she did not specifically remember transferring Plaintiff to A-Pod, but she did remember that inmates where transferred from pod to pod during this time due to the renovations of the MCDC. Sheriff Stovall also testified there were ongoing renovations during the time at issue.

The government has a legitimate interests in managing detention facilities. *Smith,* 87 F.3d at 268. The government also has a legitimate interest in maintaining security in detention facilities. *Bell*, 441 U.S. at 546-7. In determining whether Plaintiff's transfer to A-Pod was reasonably related to a security interest the Court must defer to the MCDC officials expert decisions unless there is substantial evidence indicating the officials exaggerated their response to the situation prompting Plaintiff's transfer to A-Pod. *See Bell,* 441 U.S. at 540-41, n. 23. I find moving Plaintiff to accommodate renovations of the MCDC is a reasonably related to the legitimate governmental objective of managing and maintaining security of the MCDC given the physical conditions and security issues of the MCDC prior to 2010. *See e.g., Mitchell v. Neff,* Civil No. 09-4071, 2012 WL 2449863 (W.D. Ark. May 30, 2012) (enumerating several issues with security at the MCDC in 2008 and 2009, including but not limited to, a hole in the roof where inmates could escape and doors that could be opened with broom sticks). Therefore, the Court should defer to the decisions of the officials at the MCDC in determining the transfer of Plaintiff was necessary to accommodate the management and maintain the security of the MCDC. *See Bell,* 441 U.S. at 540-41, n. 23

Lastly, the Court finds the restrictions placed on Plaintiff—daily, although time limited,

showers, use the phone, and visits the commissary; and loss of television privileges and the ability to "mingle"—are *de minimis,* and therefore, do not implicate the Constitution. *See Smith,* 87 F.3d at 268.

    B.    <u>Conditions of Confinement</u>

Plaintiff has two distinct claims regarding the conditions of his confinement in the MCDC. Plaintiff alleges his constitutional rights were violated by the lack of (1) adequate toilet paper; and (2) ability to exercise.

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis,* 523 U.S. 833 (1998) (citation omitted). The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. Detention centers must provide pretrial detainees with "reasonably adequate sanitation, personal hygiene, and laundry privileges . . . ." *Beaulieu v. Ludeman*, 690 F.3d 1017, 1045 (8th Cir. 2012) (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)). The Eighth Amendment also prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities. *Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir. 1996); *see also Hall v. Dalton,* 34 F.3d 648, 650 (8th Cir. 1994) ("[I]n this circuit, the standards applied to Eighth Amendment and Fourteenth Amendment claims have been the same.").

A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. *See Revels v. Vincenz,* 382 F.3d 870, 875 (8th Cir. 2004) (*citing Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's

10

necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner." *Revels,* 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the Plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102 (1976). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan,* 511 U.S. 825, 832 (1994).

        1.    <u>Lack of exercise</u>

A constitutional violation exists if Defendants were deliberately indifferent to Plaintiff's exercise needs. *See Wishon v. Gammon,* 978 F.2d 446, 449 (8th Cir. 1992). A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened." *Wishon,* 978 F.2d at 449. Factors the Court should consider in reviewing Plaintiff's lack of exercise claim are: (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement. *Id* . Lastly,"[c]laims under the Eighth Amendment require a compensable injury to be greater than *de minimis*," however, "[n]o clear line divides *de minimis* injuries from others." *Irving v. Dormire,* 519 F.3d 441, 448 (8th Cir. 2008). "While a serious injury is not necessary, some actual injury is required in order to state an Eighth Amendment violation. *White v. Holmes*, 21 F.3d 277, 281 (8th Cir. 1994).

Plaintiff testified he did not have regular outside recreation privileges while housed in A-Pod. Specifically, two or three months passed without outside recreation. No outside recreation

for two or three months is insufficient to demonstrate deliberate indifference to Plaintiff's health. *Rahman X v. Morgan,* 300 F.3d 970, 974 (8th Cir. 2002) (inmate denied outside recreation for three months failed to establish deliberate indifference to his health). Additionally, the Court finds credible Sergeant Miller's testimony that the procedure for out-of-cell time in A-Pod included four (4) hours in the day room each day. Even if this out-of-cell time procedure was not followed each and every day, Plaintiff's deprivation of exercise claims are not sufficiently serious to establish a Constitutional violation. *See Wishon*, 978 F.2d at 449 (forty-five (45) minutes of out-of-cell recreation time per week did not violate the Eighth Amendment rights of an inmate in protective custody); *see also Leonard v. Norris*, 797 F.2d 683, 685 (8th Cir. 1986) ((fifteen days with no out-of-cell exercise is not cruel and unusual punishment). There is no evidence in the record that the denial of exercise to Plaintiff rose to the level of deliberate indifference.

Furthermore, Plaintiff testified he did not suffer any injury from the inability to exercise. Therefore, Plaintiff's conditions of confinement claim regarding the inability to exercise is insufficient to state a constitutional violation. *See White*, 21 F.3d at 281.

    2.    <u>Lack of adequate toilet paper</u>

Plaintiff did not testify to how many days he was denied toilet paper. Sergeant Miller testified the male inmates at the MCDC received one roll of toilet paper each Monday. Plaintiff testified that he received one or sometimes two rolls of toilet paper a week, although sometimes this allotment would be late or Plaintiff would run out before the next allotment was dispersed. However, there is no evidence in the record indicating the denial of toilet paper to Plaintiff rose to the level of deliberate indifference. *See Stickley v. Byrd,* Civil No. 12-1672, 2013 WL 141726 (8th Cir. 2013) (the court found no constitutional violation when inmate, that received one roll of

toilet paper per week, was denied additional toilet paper even though the inmate consistently ran out of toilet paper before the next weekly disbursement); *Brown v. Stovall,* Civil No. 09-4008, 2010 WL 3761346, at *6 (W.D. Ark. Aug. 30, 2010) (inmate denied toilet paper for three days failed to state a violation of his Eighth Amendment rights); *see also Harris v. Fleming,* 839 F.2d 1232, 1234–36 (7th Cir. 1988) (the denial of toilet paper for five days was not cruel and unusual punishment). Therefore, Plaintiff did not establish his constitutional rights were violated by the denial of toilet paper.

Furthermore, Plaintiff testified that due to the lack of toilet paper he suffered itching and burning but it was not severe enough to visit sick-call to receive medical attention. The Court finds that burning and itching that did not warrant medical attention is *de minimis,* and therefore, cannot support an Eighth Amendment violation. *Irving,* 519 F.3d at 448.

C. Mail Policy

Lastly, Plaintiff claims the mail policy at MCDC is unconstitutional. Inmates have a First Amendment right of free speech to send and receive mail. *Hudson v. Palmer*, 468 U.S. 517, 547 (1984). "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment." *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125 (1977). Restrictions on this First Amendment right are valid "only if [they are] reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987).

Neither short delays in outgoing mail due to screening procedures nor the fact that inmates cannot seal outgoing non-privileged mail violates the First Amendment. *Thornburgh v. Abbott*, 490 U.S. 401, 415-19 (1989) (holding a policy which allows prison officials to reject incoming mail as

13

detrimental to security does not violate the First Amendment); *Smith v. Delo*, 995 F.2d 827, 830-31 (8th Cir. 1993) (policy requiring non-privileged mail to be unsealed so that it could be inspected for contraband and proper addressing not violative of the constitution).  In general, it is permissible for a jail to search incoming and outgoing prisoner mail for contraband.  *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999).  With respect to outgoing privileged mail, courts have approved policies in which legal mail must be sealed in the presence of a staff member.  *See e.g., Weatherspoon v. Ferguson*, 398 Fed. Appx. 7 (5th Cir. 2010).

Additionally, an isolated instance of outgoing mail not arriving at its destination is insufficient to state a First Amendment violation.  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (Plaintiff must show regular and unjustifiable interference—an isolated incident of mail tampering is usually insufficient to establish a constitutional violation); *Zimmerman v. Tribble,* 226 F.3d 568, 572 (7th Cir. 2000) (sporadic and short-term delays and disruptions are insufficient to state a claim under the First Amendment).

Plaintiff testified that he could seal his legal mail but had to leave his personal mail unsealed.  Also one of Plaintiff's letters was not received by its intended recipient.  The MCDC General Inmate Mail Procedures includes a legal mail section that reads: "Both INCOMING and OUTGOING legal mail will remained (sic) sealed and will not be subject to inspection under normal circumstances."  Defendants' Ex. 2 (emphasis in original)*.*  The MCDC Outgoing Inmate Mail Procedures reads: "**ALL OUTGOING MAIL** WILL BE LEFT UNSEALED IN ORDER TO FACILITATE INSPECTION AND PROCESSING BY STAFF. THE SOLE EXCEPTION WILL BE PROPERLY IDENTIFIED LEGAL MAIL. OUTGOING MAIL WHICH IS NOT LEFT UNSEALED WILL BE RETURNED TO THE INMATE."  Defendants' Ex. 3 (emphasis in

original).

These policies and procedures of the MCDC do not violate the First Amendment. Facilities may inspect non-legal outgoing mail for security purposes. *See Smith*, 995 F.2d at 830-31; *see also Harris*, 950 F.2d at 550.

Plaintiff also claims that one piece of his personal mail did not reach its intended recipient. An isolated incident of mail not reaching its destination is insufficient to state a constitutional violation. *Davis v. Goord*, 320 F.3d at 351.

### III. CONCLUSION

Accordingly, I recommend that judgment be entered in Defendants' favor and Plaintiff's Complaint (ECF No. 1) be dismissed with prejudice.

**The parties have fourteen days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **18th day of January 2013.**

/s/ Barry A. Bryant  
HON. BARRY A. BRYANT  
UNITED STATES MAGISTRATE JUDGE